James A. Dooley and Virginia P. Dooley v. Commissioner.
Dooley v. Commissioner
Docket No. 85757.
United States Tax Court
T.C. Memo 1962-305; 1962 Tax Ct. Memo LEXIS 2; 21 T.C.M. (CCH) 1633; T.C.M. (RIA) 62305; December 31, 1962
John F. Kelly, Esq., for the petitioners. Joel Yonover, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the taxable period January 1, 1955, to September 30, 1955, and the taxable year ending September 30, 1956, in *3 the amounts of $100,142.25 and $59,050.42, respectively. The issues for decision are: (1) Whether petitioners are entitled to a deduction in their fiscal period January 1 to September 30, 1955, in the amount of $129,149.66 for interest paid to Corporate Finance and Loan Corp. by checks dated September 16, 1955, in the amount of $64,364.11, the cancellation date of which was September 26, 1955, and September 29, 1955, in the amount of $64,785.55, the cancellation date of which was October 18, 1955. (2) Whether petitioners are entitled to a deduction in their fiscal year ending September 30, 1956, for coupon expense in the amount of $66,000 and costs of borrowing securities in the amount of $19,429.35. (3) Whether petitioners are entitled to a deduction for their fiscal year ending September 30, 1956, for interest paid to South Side Bank & Trust Co. in the amount of $19,692.51, which payment was made by a check dated September 27, 1956, the cancellation date of which was October 10, 1956. (4) If petitioners are not entitled to deductions for interest paid to Corporate Loan and Finance Corp. and coupon expense of borrowing securities and for interest paid to South Side Bank *4 & Trust Co., are they entitled to deduct as a theft loss, as a loss on a transaction entered into for profit, or as a capital loss, the difference in the amounts expended by them in connection with the transactions giving rise to the claimed deductions and the amounts received by them in connection with such transactions, and if so, what is the net amount deductible by petitioners in their fiscal period January 1, 1955, to September 30, 1955, and fiscal year ending September 30, 1956. (5) If petitioners are not entitled to a deduction for interest in their fiscal period January 1, 1955, to September 30, 1955, for the amount of $64,785.55 paid to Corporate Finance and Loan Corp. by check dated September 29, 1955, are they entitled to a deduction as interest paid in this amount for their fiscal year ended September 30, 1956. Petitioners in the alternative contend that if they are not entitled to the deductions claimed as interest payments, coupon expense, expense of borrowing bonds, or as losses, that they erroneously reported a long-term capital gain from the sale of United States Treasury notes in the amount of $101,031.25 for their fiscal year ending September 30, 1956, and respondent *5 concedes that if he is sustained with respect to the disallowance of the deductions claimed by petitioners, this long-term capital gain reported by them for their fiscal year ended September 30, 1956, should be eliminated in computing their taxable income for that year. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, James A. Dooley and Virginia P. Dooley, husband and wife residing in Chicago, Illinois, filed joint Federal income tax returns for their taxable period January 1, 1955, to September 30, 1955, and their fiscal year ended September 30, 1956, with the district director of internal revenue at Chicago, Illinois. James A. Dooley (hereinafter referred to as petitioner) is a lawyer, who, during the years here involved and for a number of years prior thereto, was engaged in the practice of law in Chicago, Illinois. Petitioner in late May or early June 1955 met M. Eli Livingstone at a luncheon to which he was invited by another lawyer whom he knew. He was told that there would be presented at this luncheon a financial plan in which he might be interested. At all times material hereto, M. Eli Livingstone was a registered security *6 dealer in Boston, Massachusetts, doing business under the name of Livingstone and Company (M. Eli Livingstone, both individually and in his firm name, will hereinafter be referred to as Livingstone.) Gerald G. Bolotin (hereinafter referred to as Bolotin), a Chicago attorney during the periods here involved, acted for Livingstone in seeking to interest persons in Livingstone's plans. Bolotin received a fee or commission for each contact produced by him which resulted in a transaction. John F. Baker (hereinafter referred to as Baker) was during 1955 and for a number of years prior thereto, petitioner's financial adviser. Baker was a lawyer, a registered security dealer, and vice president of Baker, Walsh & Company, a firm engaged in the buying and selling of securities. Petitioner asked Baker to accompany him to the luncheon meeting in late May or early June 1955, and Baker did accompany him. At this meeting petitioner for the first time met Bolotin and Livingstone. At this luncheon meeting Livingstone presented to petitioner a plan for purchasing Government bonds with borrowed funds, deducting for income tax purposes the interest on such borrowed funds, and obtaining a capital *7 gain with respect to the bonds. Someone at the luncheon brought up the propriety of deducting the interest and Livingstone showed petitioner two letters, one to himself and one to his wife from the Internal Revenue Service dated in 1952, which petitioner read. Thereafter petitioner, usually with Baker, met with Bolotin or Livingstone or both of them, on a number of occasions to discuss petitioner's entering into the transactions which Livingstone outlined to him. At one such meeting held about the middle of July 1955, Bolotin gave petitioner a copy of a letter dated July 5, 1955, addressed to Bolotin and signed by a member of a Chicago, Illinois law firm. The first sentence of this letter stated, "Reference is made to your letter of June 9, 1955, setting out a set of facts in connection with a proposed tax saving program involving the purchase of United States securities with certain coupons detached." The letter proceeded to discuss the deductibility of interest paid on borrowed funds used to purchase United States Treasury bonds under a certain assumed set of facts, distinguishing those assumed facts from the facts as outlined in Rev. Rul. 54-94, 1954-2 C.B. 6, under *8 which the "amount claimed as interest in connection with those so-called tax savings plans were considered not deductible." This letter considered the distinctions, among others, between the assumed facts therein discussed and the facts in Rev. Rul. 54-94, supra, to be that under the assumed facts, the taxpayer has personal liability on the note, so that there can be no doubt that there is a valid legal existing obligation and that there is clear ownership of the securities on the part of the taxpayer, so that there are no "short sale" features involved. The cost of obtaining the opinion rendered in the letter addressed to Bolotin had been paid by Livingstone, and Livingstone had authorized Bolotin to present this letter to a limited number of professional men. Petitioner read this letter and gave it to Baker for further study. In discussions between petitioner and Livingstone, Livingstone advised petitioner that he was in a position to borrow large sums of money for as little as 2 percent interest, and such funds would be available for the purchase of Government securities. Livingstone also represented to petitioner on several occasions that the securities which *9 would be used to secure the borrowings would actually be held by the lending institution and not sold by it. Livingstone also represented to petitioner that some individuals who had entered into his plan had actually made a gain therefrom. At petitioner's request Baker investigated Livingstone and studied the opinion set forth in the letter which Bolotin had given to petitioner. Baker advised petitioner that Livingstone was a registered security dealer doing business in Boston and stated to petitioner that in his opinion under the proposed facts as set forth in the letter, a genuine indebtedness was created and that interest deductions and capital gain would result from the transaction. Petitioner did some personal research with respect to the cases cited in the letter of which Bolotin had given him a copy. At a meeting held by petitioner with Livingstone and Bolotin in the early fall of 1955, petitioner decided to enter the transactions proposed by Livingstone, and as a result of this meeting the following transactions took place. Livingstone sent a letter to petitioner dated September 15, 1955, reciting a sale to petitioner of $1,000,000 face-amount United States Treasury 1 *10 7/8 percent notes due February 15, 1959, with February 15, 1956, and August 15, 1956, coupons detached, and granting petitioner an irrevocable option to sell the notes to Livingstone on or after August 15, 1956, at a price of 100 1/8. Livingstone sent petitioner a confirmation slip reciting a confirmation of a sale to petitioner of $1,000,000 face amount of United States Treasury 1 7/8 percent notes due February 15, 1959, with February 15, 1956, and August 15, 1956 coupons detached, at 95 for a total aggregate purchase price of $950,000. No commission was charged. The lack of a charge for commission is customary where a broker sells Government notes as principal and for his own account. Petitioner executed an instrument in the form of a promissory note in favor of Corporate Finance and Loan Corp. (hereinafter called CF&L) in the amount of $950,000 with interest at 3 3/8 percent per annum which provided as follows: On February 15, 1959, I promise to pay to the Corporate Finance and Loan Corp., a Massachusetts corporation at its principal office in Boston, Massachusetts, (hereinafter referred to as the obligee) the sum of NINE HUNDRED FIFTY THOUSAND AND NO/L)) DOLLARS together *11 with interest at the rate of 3 3/8% per annum, of which $64,364.11 has been prepaid by me, and the balance of $46,875.00 is to be paid as follows: $9375.00 semi-annually, beginning February 15, 1957 subject to the following rights and conditions, having deposited with the said obligee the following securities as collateral: $1,000,000 U.S. Treasury 1 7/8% Notes due February 15, 1959, with 2-15-56 and 8-15-56 coupons detached. The undersigned gives to the obligee a lien against the securities pledged for the amount of the obligations set forth herein and gives to the obligee the right to hypothecate and use the securities pledged for any purpose while so pledged. Said right is not to be inconsistent in any manner with the ownership by the undersigned of the said collateral, and with the right to the undersigned to obtain the nature of the collateral at any time upon tender of payment of the amount due hereunder. This Note has been entered into in the City of Chicago, and shall be construed and interpreted in accordance with the laws of the State of Illinois. /s/ James A. Dooley (Seal) James A. Dooley This Note and all of the terms and conditions hereof accepted this *12 fifteenth day of September, 1955. CORPORATE FINANCE AND LOAN CORP. /s/ Harry N. Cushing Treasurer By letter dated September 15, 1955, over the signature of petitioner, Livingstone was requested to deliver $1,000,000 face-amount United States Treasury 1 7/8 percent notes to CF&L against payment of $950,000. This letter was prepared in Livingstone's office, and forwarded to petitioner for his signature. By letter dated September 15, 1955, over signature of petitioner, CF&L was requested to receive the notes from Livingstone against payment to Livingstone of $950,000. This letter was prepared in Livingstone's office, and forwarded to petitioner for his signature. On or about September 15, 1955, CF&L sold $1,000,000 face amount United States Treasury 1 7/8 percent notes due February 15, 1959, with February 15, 1956, and August 15, 1956, coupons detached, to Salomon Bros. & Hutzler. At the time of this sale petitioner did not have knowledge that it had been made. By letter dated September 15, 1955, Livingstone transmitted to John F. Baker, petitioner's adviser, a check in the amount of $50,000 to be held by Baker in escrow for petitioner until April 1, 1956, at which time the *13 money could be paid over to petitioner without further authorization from Livingstone. Livingstone had volunteered to make this escrow deposit during the course of the discussions concerning petitioner's entry into the transactions when petitioner had questioned whether Livingston would be financially able to purchase the United States Treasury notes at 100 1/8 in accordance with an option granted to petitioner to sell them to him. The United States Treasury notes which were stated in Livingstone's letter to petitioner dated September 15, 1955, and in the confirmation slip sent by Livingstone to petitioner, to have been sold to petitioner were never in the physical possession of petitioner, Livingstone, or CF&L. There is a common practice among security dealers to "pair-off", thereby dispensing with physical delivery, when a security dealer has pending a buy order and a sell order of the same securities in the same face amount with receipt from an delivery to the same account. Petitioner paid the amount of $64,364.11 to CF&L by check dated September 16, 1955, the cancellation date of which is September 26, 1955. Livingstone sent a letter to petitioner dated September 29, 1955, reciting *14 a sale to petitioner of $1,150,000 face amount United States Treasury 1 7/8 percent notes due February 15, 1959, with February 15, 1956, and August 15, 1956, coupons detached and granting petitioner an irrevocable option to sell the notes to Livingstone on or after August 15, 1956, at a price of 100 1/8. Livingstone sent petitioner a confirmation slip dated September 29, 1955, reciting a confirmation of a sale, as principal and for their own account, to petitioner of $1,150,000 face amount of United States Treasury 1 7/8 percent notes due February 15, 1959, with February 15, 1956, and August 15, 1956 coupons detached at 95 5/8 for a total aggregate purchase price of $1,099,687.50. No commission was charged. Petitioner executed an instrument in the form of a promissory note under seal dated September 29, 1955, made payable to CF&L for the principal sum of $1,099,687.50 due February 15, 1959, at a rate of 3 3/16 percent interest per year. The instrument provided as follows: On February 15, 1959, I promise to pay to the Corporate Finance and Loan Corp. a Massachusetts corporation at its principal office in Boston, Massachusetts, (hereinafter referred to as the obligee) the sum of
*15 ONE MILLION NINETY-NINE THOUSAND SIX HUNDRED EIGHTY-SEVEN AND 50/100 DOLLARS together with interest at the rate of 3 3/16 percent per annum, of which $64,785.55 has been prepaid by me, and the balance of $53,906.25 is to be paid as follows: $10,781.25 semi-annually, beginning February 15, 1957 subject to the following rights and conditions, having deposited with the said obligee the following securities as collateral: $1,150,000 U.S. Treasury 1 7/8 percent Notes due February 1959, with 2-15-56 and 8-15-56 coupons detached. The undersigned gives to the obligee a lien against the securities pledged for the amount of the obligations set forth herein and gives to the obligee the right to hypothecate and use the securities pledged for any purpose while so pledged. Said right is not to be inconsistent in any manner with the ownership by the undersigned of the said collateral, and with the right to the undersigned to obtain the return of the collateral at any time upon tender of payment of the amount due hereunder. This Note has been entered into in the City of Chicago, and shall be construed and interpreted in accordance with the laws of the State of Illinois. /s/ James A. *16 Dooley (Seal) James A. Dooley This Note and all of the terms and conditions hereof accepted this twenty-ninth day of September, 1955. CORPORATE FINANCE AND LOAN CORP. /s/ Harry N. Cushing Treasurer By letter dated September 29, 1955, over the signature of petitioner, Livingstone was requested to deliver $1,150,000 face amount United States Treasury 1 7/8 percent notes to CF&L against payment of $1,099,687.50. By letter dated September 29, 1955, over signature of petitioner, CF&L was requested to receive the notes from Livingstone. Both of these letters were prepared in Livingstone's office for petitioner's signature. By letter dated October 24, 1955, CF&L advised petitioner that CF&L had received from Livingstone for petitioner's account $1,150,000 United States Treasury 1 7/8 percent notes due February 15, 1959, with two coupons detached. By letter dated September 29, 1955, Livingstone advised petitioner that Livingstone would deposit $51,000 in escrow for petitioner's benefit in consideration of petitioner's granting to Livingstone an option to purchase from petitioner $1,150,000 United States Treasury 1 7/8 notes due February 15, 1959, on or after August 15, 1956, at *17 100-2/32. By letter dated September 29, 1955, Livingstone advised the escrowee of the escrow arrangement and sent the escrowee a check for $51,000, which check was deposited in accordance with the terms. An additional $2,000 was forwarded to the escrowee on October 20, 1955, subject to the same terms and conditions. On October 20, 1955, Livingstone directed a letter to Salomon Bros. & Hutzler, New York security dealers (hereinafter referred to as Salomon), requesting that Salomon deliver to Livingstone's account at the Chemical Corn Exchange Bank, New York, among other things, $2,300,000 United States Treasury 1 7/8 percent notes of February 15, 1959, against payment of $2,300,000. In the same letter Livingstone requested Salomon to receive from Livingstone's account at Chemical Corn Exchange Bank $2,300,000 United States Treasury 1 7/8 percent notes of February 15, 1959, against payment of $2,300,000. Included in the aforementioned 1 7/8 percent notes were the 1 7/8 percent notes which were stated in Livingstone's letter to petitioner of September 29, 1955, to have been sold to petitioner. At the time of Livingstone's direction to Salomon, petitioner had no knowledge of the transaction *18 which Livingstone directed. On or about October 21, 1955, Livingstone placed an order with Salomon, directing the sale for the account of CF&L and the receipt (by Salomon) of $1,150,000 face amount United States Treasury 1 7/8 percent notes due February 15, 1959, delivery to be made from the account of Livingstone at Chemical Corn Exchange Bank against payment. At the time of this transaction, petitioner had no knowledge of it. The United States Treasury notes in the face amount of $1,150,000 which Livingstone's letter to petitioner dated September 29, 1955, recited as being a sale to petitioner never left the offices of Salomon and were never in the physical possession of petitioner, Livingstone, CF&L or the Chemical Corn Exchange Bank. Petitioner paid $64,785.55 to CF&L by check dated September 29, 1955, made payable to CF&L and delivered by petitioner to Livingstone on September 29, 1955. This check bears a cancellation date of October 18, 1955. On September 26, 1956, petitioner addressed a letter to Livingstone which stated, "I wish to exercise the 'put' previously issued to me. Will you kindly take care of this at once?" By letter dated September 25, 1956, petitioner directed *19 Livingstone to receive from his account at CF&L $1,000,000 of United States Treasury 1 7/8 percent notes due February 15, 1959, against payment to them of $952,089, and by letter dated September 25, 1956, petitioner requested CF&L to deliver from his account to Livingstone $1,000,000 United States Treasury 1 7/8 percent notes due February 1, 1959, against payment from Livingstone of $952,089 and to apply the proceeds in discharge of his obligation to CF&L in the amount of $950,000 plus interest due of $2,089. Both of these letters were prepared in Livingstone's office for petitioner's signature. Petitioner received from Livingstone a confirmation slip dated September 25, 1956, reciting a confirmation of a purchase from petitioner of $1,000,000 face amount United States Treasury 1 7/8 percent notes due February 15, 1959, at 100 1/8 for a total principal price of $100,001,250 and interest of $2,089 for an aggregate of $1,003,339. Petitioner also received a statement from Livingstone relative to his account dated September 25, 1956, reciting a sale by petitioner of the securities at 100 1/8 for $1,003,339; payment of petitioner's borrowing from CF&L of $952,089; and a resulting balance *20 due petitioner of $51,250. Petitioner received a check from Livingstone dated September 27, 1956, in the amount of $51,250, which was deposited by him on December 10, 1956. This check was not in addition to the amount previously deposited in escrow since petitioner had not in fact received that amount from the escrow account. Petitioner received a statement from CF&L dated September 25, 1956, reciting the following: Principal Amount of Note
$950,000.00
Interest due covering period
8/15/56 thru 9/25/56
2,089.00
Total
$952,089.00
RECEIVED PAYMENT
9/25/56
/s/ Harry N. Cushing
Corporate Finance and Loan Corp.
By letter dated September 25, 1956, over petitioner's signature Livingstone was advised to receive from petitioner's account at CF&L $1,150,000 United States Treasury 1 7/8 percent notes due February 15, 1959, against payment to CF&L of $1,102,089.84. By letter dated September 25, 1956, over the signature of petitioner CF&L was advised to deliver to Livingstone for petitioner's account $1,500,000 United States Treasury 1 7/8 percent notes due February 15, 1959, against payment to them of $1,102,089.84. Both of these letters were prepared in Livingstone's *21 office for petitioner's signature. Petitioner received from Livingstone confirmation slips and statements of account, and from CF&L statements with respect to the $1,150,000 United States Treasury 1 7/8 percent notes due February 15, 1959, similar in all respects to those received with respect to the $1,000,000 United States Treasury 1 7/8 percent notes, except as to amounts and date from which interest was computed, all such documents being dated September 25, 1956. These documents showed interest due CF&L covering the period August 15, 1956 through September 25, 1956, in the amount of $2,402.34 and a principal amount of note of $1,099,687.50, leaving a net as stated due petitioner from the recited sale of the securities at 100 1/8 for a total of $1,053,839.84, of $51,750. Petitioner received a check dated September 27, 1956, from Livingstone in the amount of $51,750 which was deposited by him on December 10, 1956. The net out-of-pocket expense paid by petitioner in connection with the transaction relating to the $1,000,000 face amount United States Treasury 1 7/8 percent notes due February 15, 1959, was $13,114.11. The net out-of-pocket expense paid by petitioner in connection *22 with the transaction relating to the $1,150,000 face amount United States Treasury 1 7/8 percent notes due February 15, 1959, was $13,035.55. The records of Salomon contain two confirmation slips dated July 11, 1956, one confirming the purchase as principal from petitioner of $4,000,000 United States Treasury 2 3/4 percent bonds due September 15, 1961 (hereinafter referred to as the 2 3/4 percent bonds) at a price of 99 for a principal amount of $3,960,000, accrued interest of $35,570.65, and a total amount of $3,995,570.65, and the other confirming a sale as principal to Livingstone of $4,000,000 United States Treasury 2 3/4 percent bonds due September 15, 1965, at a price of 99 plus one sixty-fourth for the principal amount of $3,960,625, accrued interest of $35,570.65, and a total of $3,996,195.65. Both confirmation slips show delivery terms as July 12, 1956, in New York at the Chemical Corn Exchange Bank. It is the custom in financial circles when a broker arranges a purchase from or to a security dealer such as Salomon, for the broker not to disclose the name of his customer. When a broker does disclose the name of the customer, a confirmation slip is issued in the name of *23 the broker for the account of the customer. The confirmation slip dated July 11, 1956, confirming the purchase from petitioner of $4,000,000 of 2 3/4 percent bonds was issued by Salomon in the name of petitioner at the specific request of Livingstone. A letter dated July 11, 1956, addressed to Salomon and signed by petitioner requested Salomon to receive from the account of Livingstone at the Chemical Corn Exchange Bank $4,000,000 United States Treasury 2 3/4 percent bonds of September 15, 1961, against payment to Livingstone of $3,995,570.65. This letter was prepared in Livingstone's office. A letter dated July 11, 1956, addressed to Livingstone over petitioner's signature requested Livingstone to deliver for petitioner's account to Salomon $4,000,000 United States Treasury 2 3/4 percent United States Treasury bonds dated September 15, 1956 against payment to Livingstone. Under date of July 12, 1956, petitioner's account with Salomon was debited with $4,000,000 United States Treasury 2 3/4 percent bonds due September 15, 1961. In connection therewith Salomon transmitted to Chemical Corn Exchange Bank its check dated July 12, 1956, drawn on its account at that bank in the amount *24 of $3,995,570.65 payable to Chemical Corn Exchange Bank. By letter dated July 17, 1956, Salomon advised Livingstone that on July 12, 1956, Salomon had delivered to Chemical Corn Exchange Bank for Livingstone's account $4,000,000 face amount United States Treasury 2 3/4 percent bonds due September 15, 1961, against payment of $3,996,195.65. Under date of July 12, 1956, petitioner addressed the following letter to Livingstone: I acknowledge receipt of $4,000,000 U.S. Treasury 2 3/4% bonds of September 15, 1961. I hereby agree that in return for the loan of these securities, I will deposit with you $4,000,000 U.S. Treasury 2 1/2% Bonds of November 15, 1961, with 11/15/56 and 5/15/57 coupons detached. I further agree that the accrued interest in the amount of $35,570.65 may be applied against the coupon maturing September 15, 1956, and that I will deposit with you cash in the amount of $170,000.00. This amount is to be applied together with coupons earned on the $4,000,000 U.S. Treasury 2 1/2% Bonds of November 15, 1961, to reimburse you for coupons due you on the securities borrowed by me. Any balance remaining in my favor on September 15, 1961, is to be accounted for by you. *25 I further agree to pay to you for the loan of these securities a premium in the amount of $66,000.00 which has been paid in advance. Under date of July 12, 1956, Livingstone addressed the following letter to petitioner: We hereby acknowledge receipt from you of $4,000,000 U.S. Treasury 2 1/2% Bonds of November 15, 1961, with 11/15/56 and 5/15/57 coupons detached, and $205,570.65 in cash to be held as security for the return of $4,000,000 U.S. Treasury 2 3/4% Bonds of September 15, 1961, which we have this day loaned to you. The cash deposit is to be applied as follows: $35,570.65 representing the accrued interest on the U.S. Treasury 2 3/4% Bonds of September 15, 1961, is to be applied against coupon maturing September 15, 1956, and the balance of $170,000.00, together with coupons earned by you on the securities, is to be deposited with us as security to reimburse us for coupons on the securities loaned to you. We agree that we will not call for the return of the securities loaned to you until September 15, 1961, that we will not call upon you for any additional collateral during the term of this contract, and that you shall not be liable for the return of these securities *26 unless the securities deposited by you shall be returned simultaneously. In consideration, we are to receive the sum of $66,000.00 as premium for the loan of securities to cover your short position, which is payable in advance. Petitioner received a confirmation slip from Livingstone showing a contract date of July 11, 1956, and payable date of July 12, 1956, reciting a sale to petitioner as principal of $4,000,000 United States Treasury 2 1/2 percent bonds of November 15, 1961, with November 15, 1956, and May 15, 1957, coupons detached at a price of 94 3/4 with a total amount of $3,790,000. On July 11, 1956, Salomon issued a confirmation slip confirming the purchase of $4,000,000 United States Treasury 2 1/2 percent bonds dated November 15, 1961, from Samuel Livingstone, brother of M. Eli Livingstone and office manager of Livingstone and Company. The confirmation slip issued in the name of Samuel Livingstone was so issued at the specific request of Livingstone. Livingstone arranged this transaction. By letter dated July 11, 1956, Samuel Livingstone requested Salomon to receive from the account of Livingstone at Chemical Corn Exchange Bank $4,000,000 United States Treasury *27 2 1/2 percent bonds due November 15, 1961, against payment of $3,905,760.87. Neither the $4,000,000 face amount 2 3/4 percent bonds nor the $4,000,000 face amount 2 1/2 percent bonds involved in the transactions heretofore described ever left the offices of Salomon nor were they ever in the physical possession of petitioner, Livingstone, Samuel Livingstone, or Chemical Corn Exchange Bank. Petitioner by check dated July 24, 1956, paid Livingstone $66,000. Under date of September 27, 1956, Livingstone wrote the following letter to Baker: We enclose our check in the amount of $47,000.00 to your order to be held by you in escrow for James A. Dooley. Under the terms of the escrow agreement, you are to deposit this money in a savings account, in your name, in any State or National Bank. You are to keep this money on deposit until February 10, 1957. At that time, you will, without further authorization from us, pay over this money to James A. Dooley. Livingstone enclosed with this letter a check in the amount of $47,000 payable to Baker. Petitioner had an option to sell the 2 1/2 percent bonds to Livingstone at 100 1/8 on September 15, 1961, provided they remained on deposit *28 with Livingstone until that date, and the right to obtain possession of the 2 1/2 percent bonds by returning the 2 3/4 percent bonds to Livingstone. Prior to entering into the transaction involving the 2 3/4 percent bonds and 2 1/2 percent bonds which petitioner has referred to at times as the straddle transaction and will hereinafter at times be so referred to, petitioner consulted an attorney and a certified public accountant with respect to the soundness of this transaction. Livingstone had represented to petitioner that the 2 1/2 percent bonds would be held by Livingstone. At the time of this transaction petitioner did not know of Livingstone's acts which dispensed with physical delivery of the 2 3/4 percent bonds and the 2 1/2 percent bonds. Petitioner decided to enter into this transaction because of the tax deduction which he believed he could obtain and because he thought there was a possibility that the bond market might react in such a way that he might make a gain from purchasing 2 3/4 percent bonds to deliver to Livingstone and selling the 2 1/2 percent bonds. Livingstone sent to petitioner a confirmation slip dated September 24, 1956, reciting a sale to petitioner *29 by Livingstone of $250,000 face amount United States Treasury 2 1/2 percent bonds due November 15, 1961, with coupons of November 15, 1956, and May 15, 1957, detached. By letter dated September 24, 1956, over signature of petitioner, Livingstone was directed to deliver the aforesaid bonds to South Side Bank & Trust Co., Chicago, Illinois (hereinafter referred to as South Side) against payment from them of $232,500. By letter dated September 24, 1956, over the signature of petitioner, South Side was directed to receive from Livingstone the aforementioned bonds for petitioner's account against payment to Livingstone of $232,500. Petitioner executed an instrument in the form of a promissory note dated September 24, 1956, to South Side in the principal amount of $232,500 due November 15, 1961, with interest at the rate of 4 percent per annum, which states as follows: Due date Nov. 15, 1961, Chicago, Illinois, Sept. 25, 1956 Amount $232,500.00 On November 15, 1961, for value received the undersigned promise to pay to the order of SOUTH SIDE BANK & TRUST CO.Chicago, Illinois
TWO HUNDRED THIRTY-TWO THOUSAND FIVE HUNDRED - Dollars with interest at the rate of 4% per cent per *30 annum and with interest at seven percent per annum after maturity until paid. It is severally agreed by the undersigned obligors that the bank (and the legal holders hereof), in consideration of the extension of credit evidenced by this note, may hold the following described collateral deposited with it as security not only for this note but as security for any obligations, liabilities, direct or contingent, now owing, or which may hereafter be owing, whether now or hereafter contracted, by any or all of the obligors hereof, whether jointly or severally, and irrespective of the lack of ownership of any of the collateral by any of the undersigned, which collateral is described as follows: $250,000 U.S. Treasury 2 1/2% Bonds of 11-15-61 with 11-15-56 and 5-15-57 coupons detached. It is hereby understood that the total interest to be charged to me is $47,817.51, of which $19,692.51 is paid in advance, and I hereby assign coupons maturing subsequent to 5-15-57 in full settlement of the balance of interest through 11-15-61. There shall be no right to call for additional collateral or for payments of this loan until November 15, 1961. Under date of September 25, 1956, petitioner addressed *31 a letter to South Side stating as follows: Thank you for your courtesy in connection with the loan we have negotiated this day. It is agreed and understood by and between us: 1. There shall be no right to call for additional collateral or for payment of this loan until November 15, 1961. 2. It is hereby understood that the total interest to be charged to me is to be $47,817.51, of which $19,692.51 is paid in advance, and coupons maturing subsequent to 5/15/57 have been assigned in full settlement of the balance of interest to November 15, 1961. 3. The Note signed by me is to be satisfied out of the disposition of the collateral held by you. 4. You shall have the right to rehypothecate, transfer, assign, sell or otherwise dispose of this collateral which you may hold as security to such rehypothecee, transferee, vendee, or assignee, and in the event of such rehypothecation, transfer, sale or assignment of the note and delivery out of the collateral hereunder, you are hereby released from responsibility to me, and I shall look to such rehypothecee, transferee, vendee, or assignee for the return of my collateral. Livingstone issued a confirmation slip dated October 9, 1956, to *32 C. F. Childs and Company, reciting a purchase by the former from the latter of $250,000 of United States Treasury 2 1/2 percent bonds of November 15, 1961. By letter dated October 9, 1956, Livingstone directed C. F. Childs to deliver to the Hanover Bank, New York, "safe-keeping for the South Side Bank and Trust Co., of Chicago, for the account of James A. Dooley," $250,000 United States Treasury 2 1/2 percent bonds of November 15, 1961, against payment. On October 9, 1956, Livingstone wrote South Side directing it to receive C. F. Childs and Company at the Hanover Bank, New York for the account of petitioner, $250,000 United States Treasury 2 1/2 percent bonds of November 15, 1961, with November 15, 1956, and May 15, 1957, coupons detached against payment to C. F. Childs of $232,500. On October 10, 1956, C. F. Childs wrote Livingstone that the bonds in question had been "delivered" to Livingstone's account at the Hanover Bank, New York. On or about October 9, 1956, CF&L "purchased" the petitioner's purported promissory note from South Side. South Side by letter dated October 12, 1956, recited delivery of the note to CF&L. On October 9, 1956, South Side wrote Hanover instructions *33 to receive the bonds from Childs against payment and charge South Side's account, and then deliver the bonds to Childs for the account of CF&L against payment and credit South Side's account. CF&L sold the bonds on October 9, 1956. Petitioner did not know at the time of the purchase by CF&L of his note to South Side or of the instructions to Hanover to receive the bonds from Childs and deliver the bonds to Childs for the account of CF&L. Livingstone had arranged the transactions between South Side and petitioner. At about the same time Livingstone had arranged a number of similar transactions between South Side and persons other than petitioner. Petitioner drew a check dated September 27, 1956, payable to South Side and on that date delivered this check to Livingstone. The cancellation date of this check is October 10, 1956. South Side opened a loan account for petitioner on October 10, 1956, credited petitioner for the payment of $19,692.51 as charges for the transaction and received payment for the loan in full that day closing out the account the same day. No loan was outstanding to petitioner on South Side's books prior to October 10, 1956, or after October 10, 1956. From *34 the payment of $19,692.51 received from petitioner, South Side deducted $1,301.66 as "interest, service charge and reimbursement of attendant expense" of the transaction, and credited the account of CF&L for $18,390.85 for "balance of unearned interest due to Corporate Finance & Loan Corp. * * *." The $250,000 face amount United States Treasury 2 1/2 percent bonds referred to never left the offices of C. F. Childs & Co., and consequently were never in the physical possession of Livingstone, petitioner, South Side, Hanover or CF&L. CF&L is a corporation which was organized in 1954 under Massachusetts laws with $1,000 of contributed capital. Thereafter, no further capital contributions were made. At all times material, Harry N. Cushing was a Boston, Massachusetts attorney, and a friend and former law associate of Livingstone, but not related to Livingstone. Cushing's law office and the office of CF&L were at all times material located in the same premises at 70 State Street, Boston, Massachusetts. At all times material, Cushing was the president and treasurer and one of the shareholders of CF&L. All other shareholders were friends, relatives, or clients of Cushing. Livingstone *35 was not a shareholder, officer, or director of CF&L. The tangible assets of CF&L consisted of client folders, books and records, a supply of letterhead stationery, and promissory notes executed in its favor by clients. CF&L maintained its bank account at the Pilgrim Trust Company in Boston. The correspondence of CF&L was typed and prepared on its letterhead stationery by Livingstone's office, for which services CF&L paid Livingstone. Cushing's principal activities as the president and treasurer of CF&L were to receive and deposit payments from clients, pay out corporate funds and maintain the files of the corporation. Cushing and one of his children, who served as clerk at the directors' meetings held three or four times each year, were CF&L's only employees. For the fiscal year ending March 31, 1956, they received salaries of $15,882 and $3,975, respectively, from CF&L. Substantially all the business of CF&L was received on reference from Livingstone. CF&L never sought or received a credit report on any person with whom it did business. CF&L maintained its books and records on the basis of a fiscal year ending March 31. For its fiscal years 1955 and 1956 it filed "Certificates *36 of Condition" with the Secretary of State of the Commonwealth of Massachusetts, showing the following assets and liabilities: Fiscal
Fiscal
year ending
year ending
March 31, 1955
March 31, 1956
Assets
Cash
$ 7,504.07
$ 2,783.06
Accounts receivable customers
65,950,323.55
280,430,957.38
Prepaid insurance, interest, taxes
45.99
37.47
Total assets
$65,947,873.61
$280,433,777.91
Liabilities
Accounts payable
$57,249,044.32
$270,812,039.97
Accrued bond expense
472,085.94
4,001,327.50
Deferred interest
2,922,092.95
6,613.528.32
Bonds borrowed
6,240,000.00
Payroll taxes withheld
195.00
Capital stock, without par
1,000.00
1,000.00
Surplus
(926,349.60)
(994,311.88)
Total liabilities
$65,957,873.61
$280,433,777.91
Throughout the taxable period here involved, there was no appreciable change in the capital structure of CF&L, and it had a surplus deficit in excess of $900,000. At the end of each fiscal year Livingstone and Cushing decided the amount to be paid to Livingstone by CF&L for the transactions which had taken place. Livingstone had the use of substantially all of CF&L's funds throughout the taxable years involved. *37 Generally, transactions between dealers in Government bonds and their customers are done by such dealers as principals. They buy the securities for cash and resell them at a higher price, so that their profit or loss is to a large extent a result of their ability to judge the market. These dealers do their purchasing in large sums with some money of their own but most of which is borrowed. Generally, dealers in Government bonds are able to obtain lower interest rates than are obtained in purchases of other types of securities because of less risk in the use of the Government bonds as collateral. Starting about the time of the close of World War II, the Government at times would authorize the exchange of certain bonds which were maturing at the maturity date for a new issue of bonds bearing a higher interest rate. This practice was referred to by dealers as a "rollover" feature in connection with Government bonds. Usually, there would be no announcement of the rollover until shortly before the maturity date of the bonds, and from time to time an increase in the price of Government bonds above par would occur shortly before the maturity date of the bonds in anticipation of the Government's *38 permitting a rollover of such bonds. There was no certainty that the Government would authorize a rollover with respect to any specific issue of bonds. The following schedule shows the yearly high and low quotations for United States Treasury 1 7/8 percent notes due February 15, 1959 for the years 1955 through 1958, the yearly high and low quotations for United States Treasury 2 3/4 percent bonds due September 15, 1961 for the years 1956 through 1960 and the quotations for the dates indicated in the year 1961, and the yearly high and low quotations for United States Treasury 2 1/2 percent bonds due November 15, 1961, for the years 1956 through 1960 and the quotations for the dates indicated in the year 1961. U.S. Treasury 1 7/8
U.S. Treasury 2 3/4
U.S. Treasury 2 1/2
percent notes due
percent bonds due
percent bonds due
February 15, 1959
September 15, 1961
November 15, 1961
Year
closing mean price
closing mean price
closing mean price
High
Low
High
Low
High
Low
1955
99.12
96.28
1956
98.2
95.28
100.15
95.21
98.31
94.8
1957
99.3
96.14
99.27
95.1
98.20
93.21
1958
100.24
99.3
102.14
97.12
101.18
96.2
1959
97.26
95.22
96.30
94.28
1960
100.3
96.6
99.27
95.8
1961
Bid
Asked
Bid
Asked
January 3
100.2
100.4
99.26
99.28
February 1
100.1
100.3
99.27
99.29
March 2
99.30
100.0
99.23
99.25
April 3
100.0
100.2
99.26
99.28
May 1
100.3
100.5
99.31
100.1
June 1
100.1
100.3
99.30
100.0
July 3
100.3
100.5
99.31
100.1
August 1
100.0
100.1
100.3
September 1
99.31
100.1
100.0
100.2
October 2
100.1
100.3
November 1
100.1
100.3
November 6
100.4
100.5
November 8
100.4
100.5
*39 Petitioners on their income tax return for the period January 1, 1955 to September 30, 1955, deducted $129,139.66 as interest paid. This deduction consisted of the payments to CF&L represented by the check for $64,364.11 to CF&L dated September 16, 1955, and $64,785.55 paid to CF&L by check dated September 29, 1955, the $10 difference between the total of these two amounts and the amount of the deduction claimed being explained by petitioner as the result of a mathematical error. Petitioners on their income tax return for their fiscal year ended September 30, 1956, deducted the amount of $66,000 represented by the check to Livingstone in this amount dated July 24, 1955, with the explanation "coupon expense" and deducted as interest expense the amount of $19,692.51 paid to South Side by check dated September 27, 1956. Respondent in his notice of deficiency disallowed the interest deduction in the amount of $129,139.66 claimed by petitioner for the period January 1, 1955 to September 30, 1955, with the explanation that this amount claimed as a deduction for interest paid is not deductible under section 163(a) or any other section of the Internal Revenue Code of 1954. Respondent *40 disallowed the deductions in the amount of $66,000 and $19,692.51 claimed by petitioners on their income tax return for their fiscal year ended September 30, 1956 as "coupon expense" and interest deduction with the explanation that these amounts are not deductible under sections 162(a), 163(a), 212, or any other section of the Internal Revenue Code of 1954. Petitioners in their amended petition claimed that they are entitled, in addition to the claimed deduction for coupon expense in the amount of $66,000 for their fiscal year ended September 30, 1956, to a deduction in the amount of $19,429.35 for payments in connection with the borrowing of securities to cover a short sale in their fiscal year ended September 30, 1956. In the alternative, petitioners claim that they are entitled to deductions in the period January 1, 1955, to September 30, 1955, and their fiscal year ended September 30, 1956, for out-of-pocket expenses in connection with the bond transactions which gave rise to their claimed deductions for interest and coupon expenses in this taxable period and fiscal year. Opinion The deductions for interest claimed by petitioner for the payments in the amount of $129,139.66 *41 made to CF&L during his fiscal period January 1, 1955, to September 30, 1955 (assuming that the check dated September 29, 1955, constituted a payment in September 1955) were made under circumstances, though deviating in some respects, not materially different from those involved in other transactions arranged by Livingstone which have been considered in other cases before this Court. In each of these cases, we have held that the amounts did not represent payments of interest on bona fide loans and were not deductible as interest paid. Eli D. Goodstein, 30 T.C. 1178 (1958), affd. 267 F. 2d 127 (C.A. 1, 1959); George G. Lynch, 31 T.C. 990 (1959), affd. 273 F. 2d 867 (C.A. 2, 1959); Leslie Julian, 31 T.C. 998 (1959), affd. 273 F. 2d 867 (C.A. 2, 1959); Egbert J. Miles, 31 T.C. 1001 (1959); Morris R. DeWoskin, 35 T.C. 356 (1960); Perry A. Nichols, 37 T.C. 772 (1962); and Becker v. Commissioner, 277 F. 2d 146 (C.A. 2, 1960), affirming on this issue a Memorandum Opinion of this Court. Petitioner does not contend that the actual facts involved in the instant *42 case differentiate the transactions here involved from those involved in the cases heretofore set forth, but argues that under the decision of the Supreme Court in Knetsch v. United States, 364 U.S. 361 (1960), the intent of the taxpayer should be considered the determining factor and that petitioner in the instant case intended the transactions here involved to constitute real loans and intended to make an economic gain from the transactions. Petitioner stresses the fact that he did not intend that CF&L sell the bonds which he agreed to pledge to secure what he intended to be a loan to him from CF&L, that he had been assured by Livingstone that the bonds would be retained by the lending agency and he did not know of the arrangements that Livingstone made whereby the bonds were never in the physical possession of the lending agency. A similar argument was rejected in Perry A. Nichols, supra, and Rubin v. United States, 304 F. 2d 766 (C.A. 7, 1962). Cf. MacRae v. Commissioner, 294 F. 2d 56 (C.A. 9, 1961), affirming in part 34 T.C. 20 (1960). Even if petitioner's intention were a determining factor in this case, our *43 conclusion would not be changed. The evidence does not support petitioner's contention as to his intention in entering into the transactions. Petitioner did have a number of discussions with Livingstone prior to entering into the transactions, and Livingstone did state to him that he lending agency would not sell the bonds short, but the clear inference from the evidence is that petitioner's primary intention was to take prearranged formal steps to secure a tax deduction. The substance of all of petitioner's discussions with Livingstone concerned whether he would be able to get a tax deduction for the amounts he was to pay to CF&L. The opinion which petitioner stresses he relied on, written by a Chicago law firm, began by referring to a proposed tax saving program involving the purchase of United States securities. Petitioner was a lawyer who had been engaged in practice for a number of years and the fact that he signed a note which permitted the lending agency to sell the bonds refutes any real intention on his part that the bonds be retained by the lending agency. Petitioner was cautious to require an escrow deposit from Livingstone to guarantee Livingstone's performance on the repurchase *44 of the bonds at 100 1/8, should petitioner decide to exercise the right granted to sell the bonds to Livingstone at that price. However, petitioner made no investigation of CF&L to determine whether it had available funds to lend petitioner for an actual purchase of bonds. Petitioner relied on Livingstone to prepare all documents which he signed in connection with the transactions. Had petitioner really intended that the bonds be retained by the lending agency, he would certainly have made some investigation to determine that the lending agency had funds available to make actual loans in the amounts necessary to purchase the bonds. The evidence likewise fails to support petitioner's contention that he intended to make an economic gain aside from income tax saving from these transactions. It is to be noted that nowhere in petitioner's testimony did he precisely refer to the making of an economic gain without consideration of the gain resulting to him by obtaining a tax reduction. The possibility of any gain arising from these transactions except through savings in income tax was so remote as to be virtually nonexistent. Petitioner agreed to pay interest at 3 3/8 percent per annum *45 on a note of $950,000 and 3-3/16 percent interest per annum on a note of $1,099,687.50, and prepaid $64,364.11 and $64,785.55, respectively, with no agreement for any refund upon early repayment of the notes. The yield on the $1,000,000 and $1,150,000 of bonds was 1 7/8 percent and the first year's interest coupons were detached from these bonds. It is obvious, therefore, that the bonds would had to have been sold for over 101 1/2 for petitioner to have broken even on this transaction without reference to the tax effects. In the instant case, as in Knetsch v. United States, supra, there was nothing of substance to be realized by petitioner from the transactions beyond a tax deduction. We, therefore, sustain respondent in the disallowance of the claimed interest deduction in the amount of $129,139.66 for petitioner's taxable period January 1, 1955, to September 30, 1955. Since in our view the payments made by the checks to CF&L in September 1955 were not payments of interest on an indebtedness of petitioner, it is unnecessary to consider petitioners' alternative contention that the payment made by the check dated September 27, 1955, is deductible in computing their income *46 tax for their fiscal year ended September 30, 1956. While deduction of $66,000 claimed by petitioners in their fiscal year 1956 as coupon expense or payment for borrowing bonds results from a transaction in a somewhat different form from the transactions in other cases dealing with tax saving plans arranged by Livingstone, there exists no more substance in this so-called straddle transaction than in the so-called purchase of bonds involved in petitioner's transaction in September 1955 or in the other similar plans arranged by Livingstone which have been held to be shams. Cf. Egbert J. Miles, supra, and George G. Lynch, supra. In fact, petitioner borrowed no bonds. Livingstone arranged the entire transaction and entered a sale order designating that petitioner's name be shown on the confirmation slip and [simultaneously] entered a purchase order, and the two orders cancelled each other. Therefore, irrespective of how denominated, the $66,000 was not paid for the borrowing of the 2 3/4 bonds by petitioner from Livingstone or for coupon expense in connection with any borrowing of bonds. Similarly, the transaction with respect to the 2 1/2 percent bonds *47 which was set up on paper as a purchase by petitioner of bonds to be deposited with Livingstone as security for the return of the 2 3/4 percent bonds had no substance. The so-called purchase of these bonds by petitioner from Salomon was offset by a so-called sale by Salomon to Samuel Livingstone, all of which was arranged by Livingstone and no bonds were actually ever deposited with Livingstone. The fact that petitioner did not know that these bonds were never actually delivered to Livingstone is occasioned by his complete reliance on Livingstone to arrange the entire transactions without investigation as to the arrangements made. He signed the papers prepared by Livingstone which permitted this transaction be carried through in the manner in which it was accomplished. The clear inference from the record is that petitioner's only interest in this transaction was in obtaining a tax deduction and that the $66,000 was paid to Livingstone for his supposed arranging such a tax deduction. Petitioner has pointed to no provision of the Internal Revenue Code which permits such a deduction. Petitioner in his argument cites a number of cases which he contends hold that expense occasioned *48 by borrowing bonds to sell short is deductible under section 212 of the Internal Revenue Code of 1954. Petitioner quotes at some length from Dart v. Commissioner, 74 F. 2d 845 (C.A. 4, 1935), reversing 29 B.T.A. 125, and cites Rev. Rul. 62-42, 1962-1 C.B. 133. Petitioner also cites and relies on Commissioner v. Wiesler, 161 F. 2d 997 (C.A. 6, 1947), affirming [6 T.C. 1148], 10 T.C. 251 (1946). No discussion of the differences in the transactions here involved from those dealt with in these cases would be useful since we hold that the substance of the transactions here involved did not amount to a short sale by petitioner of 2 3/4 percent bonds and borrowing of bonds from Livingstone for use as delivery under the requirements of a short sale. The transactions here involved were not transactions entered into for profit except such profit as might result to petitioner as tax saving and this type of transaction does not support a deduction under section 212 of the Internal Revenue Code of 1954. Petitioner has pointed to no other section of the Internal Revenue Code which *49 would entitle him to a deduction of the $66,000 paid in July 1956 to Livingstone. Petitioner arrives at the $19,429.35 which he claims to be deductible as paid for using the 2 3/4 percent bonds during 1956 by subtracting the amount of accrued interest on such bonds as of July 11, 1956, as shown on Livingstone's books from the amount of the September 15, 1956, coupon on such bonds of $55,000 as shown on Livingstone's books. Petitioner contends that the September 15, 1956, coupon was paid by the application of the accrued interest of $35,570.65 and the balance of $19,429.35 was deducted from petitioner's cash deposit of $170,000 with Livingstone. Respondent contends that the evidence fails to establish that petitioner in fact paid the $19,429.35 to Livingstone in his fiscal year ended September 30, 1956. We need not determine whether the entries made upon Livingstone's books would be sufficient to constitute a payment to Livingstone by petitioner of $19,429.35 if petitioner had in fact borrowed 2 3/4 percent bonds from Livingstone, since petitioner did not in fact borrow any such bonds. Therefore, petitioner has shown no basis to support the claimed deduction of $19,429.35. Cf. *50 Empire Press, Inc., 35 T.C. 136 (1960). There is no showing in the record that the payment to South Side of $19,692.51 by check dated September 27, 1956, was a payment by petitioner to that bank prior to September 30, 1956. Petitioner delivered to Livingstone on September 27, 1956, his check made to the order of South Side, and the record does not show when Livingstone delivered this check to the bank but a fair inference is that it was not delivered to the bank until October 9, 1956, when Livingstone placed the buy and sell orders for the $250,000 of bonds. Petitioner argues that Livingstone was the agent for the bank and that the delivery of the check to Livingstone was in effect payment of the interest to the bank in his fiscal year ended September 30, 1956. The evidence shows that Livingstone arranged for South Side to play the part in the transactions which it did, which was in effect to have the purported loan pass through it to CF&L. However, there is nothing in the record to show that in arranging this transaction Livingstone was not petitioner's agent as distinguished from being the agent of South Side. The drawing of a check by petitioner and placing it with *51 Livingstone would not constitute a payment to the bank until delivery of the check to South Side. Petitioner has not shown that he paid the amount of $19,692.51 to South Side in his fiscal year ended September 30, 1956, and, therefore, ws sustain respondent in his disallowance of petitioner's claimed deduction for his fiscal year 1956 in the amount of $19,692.51. Petitioner in the alternative contends that if he is not entitled to the claimed interest deductions and deductions for coupon expense, he should be entitled to his net out-of-pocket losses either as losses from theft, losses from transactions entered into for profit, or capital losses. The only evidence of net out-of-pocket losses by petitioner during the years here involved is with respect to the $1,000,000 and $1,500,000 of 1 7/8 percent bonds which were the subject of the transactions in September 1955. The net out-of-pocket losses from these transactions are stipulated. So far as the evidence here shows there had been no purported close out of the straddle transaction or the transaction with respect to the 2 1/2 percent bonds before the end of petitioner's fiscal year 1956. Respondent contends that petitioner has *52 raised the question of theft losses for the first time on brief, but we need not pass on this contention since we think it clear that petitioner has not produced evidence sufficient to show that these net out-of-pocket losses were in fact theft losses. While petitioner did not know some of the details of Livingstone's handling of these transactions, he did know that he was entering into a plan proposed by Livingstone which he could reasonably hope to result in a profit only through a tax savings. The payments by and receipts of petitioner under his arrangement, were insofar as the evidence here shows exactly the amounts which his agreements with Livingstone provided. Petitioner sustained no losses because of any misrepresentations to him by Livingstone. Cf. Miles v. Livingstone, 301 F. 2d 99 (C.A. 1, 1962). Since, as we have set out above, the only profit that petitioner reasonably could hope to make was by a tax saving, the transactions here involved were not entered into for profit in its normally accepted meaning, and the losses, therefore, did not arise from a transaction entered into for profit. Morris R. DeWoskin, supra. Cf. Arata v. Commissioner, *53 277 2d 576 (C.A. 2, 1960), modifying 31 T.C. 346 (1958); and Ewing v. Commissioner, 213 F. 2d 438 (C.A. 2, 1954), affirming 20 T.C. 216 (1953). Petitioner in the instant case exercised no option to sell the 1 7/8 percent bonds to Livingstone, as he had no possibility of loss from failure to exercise an option. Respondent concedes that petitioners did not realize the capital gain of $101,031.25 on the sale of 1 7/8 percent bonds reported by them for the period January 1, 1955, to September 30, 1955. Decision will be entered under Rule 50.